THE ESTATE OF ELEANOR HODGES,        )
SUSAN M. SCHOCH, EXECUTRIX,          )
                                     )        Civil Action
                    Plaintiff        )        No. 12-cv-01698
                                     )
         vs.                         )
                                     )
GREEN MEADOWS, and                   )
EMERITUS ASSISTED LIVING,            )
                                     )
                    Defendants       )

                         *    *    *

APPEARANCES

            LINDA S. LUTHER-VENO, ESQUIRE
                 On behalf of plaintiff

            WILLIAM J. MUNDY, ESQUIRE
                 On behalf of defendants

                         *    *    *


                    O P I N I O N

JAMES KNOLL GARDNER
United States District Judge

        The matter before the court is Defendant's Rule

12(b)(6) Motion to Compel Arbitration and Dismiss Counts II, III,

and IV of the Complaint ("Defendants' Motion")[1], which was filed

---

[1]     Plaintiff named "Green Meadows" and "Emeritus Assisted Living" as
"Defendants" in the caption of the Complaint.  As noted below, Green Meadows
is a fictitious name registered to Emeritus Corporation (which is not a party
to this litigation).  It is unclear from the record whether Emeritus Assisted
Living is a corporation or a fictitious name, or to whom, if anyone, it is
registered.  However, Green Meadows and Emeritus Assisted Living are different
entities.

        Defendants refer to themselves in the singular (e.g., "Defendant's
Rule 12(b)(6) Motion to Compel").  Plaintiff refers to defendants in the
plural (e.g., Plaintiff's Opposition to Defendants' 12(b)(6) Motion").
Throughout this Opinion I will refer to defendants in the plural, except when
referring to the exact title of a document which refers to defendant in the
singular.

on April 10, 2012.[2]  On August 10, 2012 Plaintiff's Opposition to Defendants' 12(b)(6) Motion to Compel Arbitration ("Plaintiff's Opposition") was filed.[3]  On September 5, 2012 defendants filed their Reply Brief in Support of Defendant's 12(b)(6) Motion to Compel Arbitration ("Defendants' Reply Brief").[4]

For the following reasons, defendants' motion to compel arbitration is granted.  Specifically, I conclude that plaintiff's claim is covered by a binding arbitration agreement between the parties.

## JURISDICTION

Jurisdiction in this case is based on diversity jurisdiction pursuant to 28 U.S.C. § 1332.

Plaintiff Susan Schoch, executrix of the Estate of Eleanor Hodges is a citizen of the Commonwealth of Pennsylvania. At the time of her death plaintiff's decedent, Eleanor Hodges, was a citizen of the Commonwealth of Pennsylvania.[5]

---

[2]     The motion was accompanied by a Memorandum of Law in Support of its Motion to Dismiss Pursuant to Fed.R.C.P. 12(b)(6) ("Defendants' Memorandum") and Exhibits A and B, which were referred to in both the motion and memorandum.

[3]     Plaintiff's response to the motion to compel arbitration was accompanied by Plaintiff's Brief in Support of Opposition to Defendants' 12(b)(6) Motion to Compel Arbitration ("Plaintiff's Brief") and nine Exhibits. Plaintiff does not label the attached Exhibits.  However, I label and identify them in paragraph 2(B) of the accompanying Order as Exhibits 1 through 9.

[4]     Defendants' reply brief was accompanied by Exhibits A through D.

[5]     Pursuant to §1332(c)(2), "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent".  I interpret this to mean that the executrix shall be deemed to be

(Footnote 5 continued):

Defendants operate Green Meadows, the real property at 1545 W. Greenleaf Street, Allentown, Pennsylvania. Green Meadows is a fictitious name registered to Emeritus Corporation. Emeritus Corporation is a Washington corporation with its principal place of business in Seattle, Washington.

The real property at 1545 W. Greenleaf is owned by Emerichip Allentown, LLC. Emerichip Allentown, LLC is a limited liability company whose sole member is Emeritus Corporation.[6]

Accordingly, plaintiff is a citizen of Pennsylvania and defendants are citizens of Washington.

Plaintiff alleges that the amount in controversy exceeds $75,000.00.[7]

---

(Continuation of footnote 5):

a citizen only of the state of which the decedent was a citizen at the time of the decedent's death.

Neither the Complaint nor the Notice of Removal aver the citizenship of the decedent, Eleanor J. Hodges. Although the Notice of Removal does not definitively establish diversity jurisdiction because it does not indicate the citizenship of Mrs. Hodges at the time of her death, the record supports the inference that she was a citizen of the Commonwealth of Pennsylvania because she died in the Green Meadows nursing facility in Allentown, Pennsylvania, and because the decision to place her there initially was based on the fact that Mrs. Hodges would be comfortable at Green Meadows because she had lived in the neighborhood with her husband in the same house from 1953 to 2007, and alone after her husband's death in 2007 until 2010 when she moved to Green Meadows. (Exhibit B to Defendants' Reply Brief, Oral deposition testimony of Susan Schoch, July 30, 2012 ("N.T. Schoch"), pages 9-10 and 46-47.

[6] According to the Notice of Removal, defendant Emeritus Assistant Living is not a currently registered fictitious name. Plaintiff's Complaint avers that Emeritus Assisted Living is the corporate parent of Green Meadows and is a Washington corporation with its principal place of business in Seattle, Washington. Accordingly, whether defendants' proper identification is Emeritus Assisted Living or Emerichip Allentown, LLC, it is a citizen of the state of Washington for diversity purposes.

[7] See Notice of Removal, ¶ 14.

- 3 -

<u>VENUE</u>

Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the plaintiff's claims allegedly occurred in Allentown, Lehigh County, Pennsylvania, which is within this district.

<u>PROCEDURAL HISTORY</u>

On March 15, 2012 plaintiff, Susan M. Schoch as the Executrix of the Estate of Eleanor Hodges,[8] filed a four-count Complaint[9] against defendants Green Meadows and Emeritus Assisted Living in the Court of Common Pleas in Lehigh County, Pennsylvania.[10] On April 4, 2012 defendants filed a Notice of

---

[8]     In the caption of the Complaint, plaintiff is designated "THE ESTATE OF ELEANOR J. HODGES, SUSAN M. SCHOCH, EXECUTRIX, Plaintiff". The introduction of the Complaint states, "AND NOW, comes Plaintiff Susan M. Schoch, Executrix of the Estate of Eleanor J. Hodges, by and through her Legal Counsel, Linda S. Luther-Veno, Esquire, and files the within COMPLAINT." Paragraph 1. of the complaint states: "1. Plaintiff is Susan M. Schoch, Executrix of the Estate of Eleanor J. Hodges.... Attached hereto and marked as **Exhibit A** is [a] Short Certificate evidencing Susan M. Schoch's appointment as Executrix.

        The caption and the language of the Complaint and the nature of this action indicates that there is one plaintiff, Susan M. Schoch, Executrix of the Estate of Eleanor J. Hodges, Deceased. Neither Mrs. Hodges, her estate, or Mrs. Schoch in her individual capacity are plaintiffs. Therefore, this is a survival action brought on behalf of Mrs. Hodges by the Executrix of her estate, and not a wrongful death action brought my Mrs. Schoch individually,

[9]     Exhibit B to Notice of Removal, copies of the Complaint filed by plaintiff March 15, 2012 in the Court of Common Pleas of Lehigh County, Pennsylvania, case number 2011-C-1831 ("Complaint") are attached as Exhibit B to each of Defendants' Motion, Defendants' Memorandum, Plaintiff's Opposition, and the Notice of Removal.

[10]     Count I of the Complaint asserts a Pennsylvania state-law claim for Professional Negligence and Breach of Duty of Care against defendants. Count II alleges Breach of Contract. Count III alleges violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1. Count IV alleges that plaintiff was entitled to Punitive Damages.

Removal, which removed the action to this court.

On April 10, 2012 defendants filed their 12(b)(6) motion to compel arbitration alleging that all of plaintiff's claims were covered by a binding arbitration agreement. Defendants also sought dismissal of Counts II through IV for failure to state a claim. Plaintiff did not respond to defendants' motion.

Therefore, by Order dated June 4, 2012 and filed June 5, 2012, I granted defendants' motion to compel arbitration as unopposed to the extent it sought to compel arbitration. I dismissed the motion as moot to the extent that it sought dismissal of Counts II through IV on the merits. Accordingly, I dismissed plaintiff's complaint without prejudice for plaintiff to raise the issues within her complaint in arbitration.

On June 8, 2012 plaintiff and defendants filed a joint motion to vacate my June 4, 2012 Order. The parties indicated that, although they did not inform the court, they had previously agreed to dismiss Counts II through IV of plaintiff's Complaint and conduct limited discovery solely on the issue of the validity and enforceability of the arbitration agreement.

Therefore, by Order dated and filed June 20, 2012, I granted the joint motion to vacate my June 4, 2012 Order and reinstated defendants' motion to compel arbitration. Pursuant to the joint motion, Counts II through IV were dismissed.

Accordingly, the only remaining issue concerning defendants' motion to dismiss is the validity and enforceability of the arbitration agreement.

On August 10, 2012 plaintiff filed Plaintiff's Opposition to Defendant's 12(b)(6) Motion to Compel Arbitration. On September 5, 2012 defendants filed a reply brief.

## STANDARD OF REVIEW

The Federal Arbitration Act, 9 U.S.C. §§ 1 - 16, authorizes the enforcement of contractually valid and enforceable arbitration agreements.  Id. § 4.  A court's analysis of a motion to compel arbitration is "limited to a narrow scope of inquiry...such as whether an arbitration agreement applies to a particular controversy, or whether the parties are bound by the arbitration clause."  In re Pharmacy Benefit Managers Anti-Trust Litigation, (MDL 1782), 700 F.3d 109, 116 (3d Cir. 2012).  A district court shall order arbitration of the parties dispute if it is "satisfied that the making of the agreement for arbitration...is not in issue."  Par-Knit Mills, Inc. v. Stockbridge Fabrics Company, LTD., 636 F.2d 51, 54 (3d Cir. 1980), citing 9 U.S.C. § 4.

However, if a factual dispute concerning the validity of the agreement to arbitrate is in issue, a trial shall be commenced solely on the validity of the arbitration agreement. The party allegedly in default of a binding arbitration clause

may request to have the issue heard by a jury.  9 U.S.C. § 4;
Par-Knit Mills, 636 F.2d at 54.

Traditionally, a motion to compel arbitration is
analyzed using the same standard of review as a motion to dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(6).  Palcko v.
Airborne Express, Inc., 372 F.3d 588, 597-98 (3d Cir. 2004).
However, when a party challenges the validity and enforceability
of the arbitration agreement, the parties may conduct limited
discovery on that issue.  See Parilla v. IAP Worldwide Services
VI, Inc., 368 F.3d 269, 284 (3d Cir. 2004).  In cases allowing
limited discovery, courts apply the standard of review applicable
to motions for summary judgment brought pursuant to Rule 56 of
the Federal Rules of Civil Procedure.  Id.

Accordingly, when applying the standard of review for
summary judgment to a motion to compel arbitration, the district
court "must determine whether a factual dispute exists as to the
validity of the Agreement."  Hopkins v. New Day Financial,
643 F.Supp.2d 704, 714 (E.D.Pa. 2009)(Slomsky, J.).  If none is
found, the court need not conduct a trial on that issue.  Id.

In determining whether a factual dispute exists, the
court must determine whether "the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue of
material fact."  See Fed.R.Civ.P. 56(c); see also Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Federal Home Loan Mortgage Corporation v. Scottsdale Insurance Company, 316 F.3d 431, 433 (3d Cir. 2003); Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F.Supp.2d 474, 478 (E.D.Pa. 2011)(Dalzell, J.).  Only facts that may affect the outcome of a case are "material".  Moreover, all reasonable inferences from the record are drawn in favor of the non-movant.  Anderson, supra.

        Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof.  See Watson v. Eastman Kodak Co., 235 F.3d 851, 858 (3d Cir. 2000).  Plaintiff cannot avert summary judgment, or in this case defeat a motion to compel arbitration, with speculation or by resting on the allegations in his pleadings, but rather he must present competent evidence from which a jury could reasonably find in his favor.  See Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa. 1995)(Reed, J.).

                                FACTS

        Upon consideration of the pleadings, record papers, exhibits, affidavits, and depositions, and drawing all reasonable

inferences in favor of plaintiff as required by the forgoing standard of review, the pertinent facts are as follows.

On approximately March 23, 2010[11] Eleanor Hodges was diagnosed with dementia. Susan Schoch, Mrs. Hodges' daughter with power of attorney,[12] was advised that because of dementia her mother would need to be placed in a special care facility providing locked units in order to protect Mrs. Hodges from wandering off or harming herself.[13]

Mrs. Schoch compiled a list of twelve facilities in the greater Lehigh Valley area of Pennsylvania which met her mother's requirements. However, the only facilities with available beds in secured units were Green Meadows, in Allentown, and Lehigh Commons, in Macungie.[14]

On March 25, 2010 Mrs. Schoch and her sister visited Green Meadows and spent roughly one-and-one-half hours touring the facility. During the tour, Mrs. Schoch advised the facility's representative[15] of her mother's "imminent need" for a

---

[11]    The record does not establish the precise date Mrs. Hodges was actually diagnosed. However, it appears to have been between March 18 and March 23, 2010. Plaintiff's Response Brief Exhibit 2, Affidavit of Susan M. Schoch, Executrix (affidavit), ¶¶ 3 and 4.

[12]    Mrs. Schoch was made Mrs. Hodges' attorney-in-fact on June 8, 2009. N.T. Schoch, pages 12.

[13]    Affidavit, ¶¶ 3 and 4.

[14]    N.T. Schoch, page 45; Affidavit ¶ 6.

[15]    During her deposition, Mrs. Schoch was initially unsure as to the name of the representative giving the tour but believed it to be Christine Krueger. N.T. Schoch, page 28.

special care facility and that the safety and security of her mother was very important.[16]  Mrs. Schoch was satisfied with the "assurances of security by the representative" and chose Green Meadows as the facility for her mother.[17]

Upon conclusion of the tour, the Green Meadows' representative presented Mrs. Schoch and her sister with an 87-page admission packet, including a stand-alone two-page arbitration agreement.  The relevant language of the arbitration agreement is as follows:

AGREEMENT TO RESOLVE DISPUTES BY BINDING ARBITRATION

*    *    *

2.    <u>Agreement to Binding Arbitration</u>. The Parties agree that...unless expressly prohibited by applicable law, any action, dispute, claim or controversy of any kind, whether in contract or in tort, statutory or common law, personal injury, property damage, legal or equitable or otherwise, arising out of the provision of assisted living services, healthcare services, or any other goods or services provided under the terms of any agreement between the Parties, including the disputes involving the scope of this Arbitration Agreement, or any other dispute involving acts or omissions that cause damage or injury to either Party, except for matters involving evictions, shall be resolved exclusively by binding arbitration and not by lawsuit or resort to judicial process, except to the extent that applicable law provides for judicial review of arbitration proceedings.

---

[16]    Affidavit, ¶ 9.

[17]    Affidavit, ¶¶ 8 and 9.

4.  <u>Right to Legal Counsel</u>. The Resident has the
    right to be represented by legal counsel in
    any arbitration proceedings, and the Resident
    has the right to have this Arbitration
    Agreement reviewed by legal counsel prior to
    signature.

                    *   *   *

7.  <u>Opt Out Provision</u>. This provision for
    arbitration may be revoked by written notice
    delivered to the Community by certified mail
    within 15 days of signature.

    *The Resident understands that the result of this
    Arbitration Agreement is that claims, including
    personal injury claims that the Resident may have
    against the Community cannot be brought in a
    lawsuit in court before a judge or jury, and
    agrees that all such claims will be resolved as
    described in this Arbitration Agreement.
    Admission to the Community is not contingent upon
    signing this Agreement.*[18]

Mrs. Schoch signed the agreement, along with all other documents

on March 25, 2010.[19]

Mrs. Schoch's description of the circumstances in which

she signed the arbitration agreement are somewhat inconsistent.

Specifically, Mrs. Schoch's accounts of her signing the agreement

as stated in her affidavit differ from her accounts as stated in

her earlier deposition.  As such, both accounts of the

---

[18]    Arbitration Agreement, §§ 2, 4, and 7, and page 2 (emphasis in
original).

[19]    Affidavit, ¶ 13; Exhibit C to Defendant's Reply Brief, Agreement
To Resolve Disputes By Binding Arbitration, ("Arbitration Agreement").

circumstances in which Mrs. Schoch signed the agreement to arbitrate are described below.[20]

In her affidavit, Mrs. Schoch unequivocally stated "[t]he Green Meadows representative made it clear to me that I had to sign all of the documents presented to me in order for my mother to be admitted to Green Meadows." She also stated that the representative "spent just minutes going over all of the documents and brochures, and then handed them to me one by one to sign."[21]

She further indicated that she signed the documents "as a matter of course" but was adamant that she never contemplated that the arbitration agreement would cover intentional acts resulting in death.

However, during her deposition Mrs. Schoch stated that she and her sister were provided an overview of the entire admission packet and "basically everything was talked about firsthand," including the arbitration agreement.[22] Moreover, Mrs. Schoch and her sister were given an opportunity to ask questions about all of the documents including the arbitration

---

[20]    Mrs. Schoch's affidavit was sworn to and subscribed on August 8, 2012 and was submitted as Exhibit 2 to plaintiff's brief. Mrs. Schoch's deposition took place on July 31, 2012 and was submitted as Exhibit B to defendants' reply brief.

[21]    Affidavit, ¶¶ 11 and 12.

[22]    N.T. Schoch, page 29.

agreement.  In fact, Mrs. Schoch asked questions about some of the other documents presented to her.[23]

Mrs. Schoch stated that her understanding of the coverage of the agreement included issues such as slip-and-fall injuries and theft or damage to her personal property.  She also said that she understood that residents do not always get along and that there might be a "squabble here and there" or that "somebody might scratch somebody or slap somebody or have a little bit of a dispute."[24]

Neither Mrs. Schoch, her sister, or the representative discussed the issue of whether the arbitration agreement covered the death of a resident.  Nor did Mrs. Schoch or her sister ask any questions regarding the scope of the arbitration agreement even though they were both given an opportunity to do so.  However, Mrs. Schoch indicated that she was comfortable that she understood what the agreement meant.[25]

Although the defendants' representative never explicitly explained to Mrs. Schoch that Mrs. Hodges' admittance to Green Meadows was contingent on her signing the arbitration agreement, Mrs. Schoch stated that she understood what "voluntary" meant and that by signing, she was "actually agreeing

---

[23]    N.T. Schoch, page 42.

[24]    N.T. Schoch, pages 33-37 and 43.

[25]    N.T. Schoch, pages 40-42.

to arbitration for certain injuries that [her] mother might have."[26]

Further, Mrs. Schoch acknowledged the existence of the revocation provision in paragraph 7 of the arbitration agreement, which authorized her to revoke the arbitration agreement 15 days after signing it.[27]

After signing the agreement, Mrs. Schoch received in the mail a copy of the application packet, including the arbitration agreement, and reviewed it again. Mrs. Schoch did not exercise her rights pursuant to the revocation provision.[28]

On March 30 or March 31, 2010 Mrs. Hodges was admitted as a resident of Green Meadows. On November 7, 2012, Edward Jones, another resident of Green Meadows, intentionally pushed Mrs. Hodges. On November 20, 2010, as a result of the injuries she sustained after being pushed, Mrs. Hodges died.[29] Mrs. Hodges' death was ruled a homicide by the Lehigh County Coroner's office.[30]

At the time of her death, Mrs. Hodges was 84 years old. Mrs. Schoch was appointed executrix of Mrs. Hodges' estate. On

---

[26]    N.T. Schoch, page 48.

[27]    The arbitration agreement gives the signatory fifteen (15) days from the date of signing to revoke the agreement. That date would have been April 9, 2010.

[28]    N.T. Schoch, pages 38, 40, and 41.

[29]    On January 26, 2011 Mr. Jones also died.

[30]    Affidavit, ¶ 3; Complaint, ¶ 4.

March 15, 2012 Susan Schoch, on behalf of Mrs. Hodges' estate, filed the within action.[31]

CONTENTIONS OF THE PARTIES

Contentions of Defendants

Defendants seek dismissal of plaintiff's complaint and an order compelling arbitration.  Specifically, defendants contend that the agreement to arbitrate is valid and enforceable and covers plaintiff's negligence claim, brought as Count I in the Complaint.

Accordingly, defendants argue that this case should be heard before an arbitrator pursuant to the agreement to arbitrate.

Contentions of Plaintiff

Plaintiff contends that the arbitration provision that she signed as part of Green Meadows' resident agreement is invalid and unenforceable.  Specifically, plaintiff contends the arbitration provision is both procedurally and substantively unconscionable.

In the alternative, plaintiff contends that her negligence claim does not fall within the scope of the purported agreement to arbitrate.  Accordingly, plaintiff argues that this court should retain jurisdiction and proceed on the merits of her negligence claim.

---

[31]    Complaint, ¶¶ 4 and 9 - 22.

In response to "traditional judicial hostility to the enforcement of arbitration agreements," Congress enacted the Federal Arbitration Act in 1925 establishing "a strong federal policy in favor of the resolution of disputes through arbitration." Alexander v. Anthony International, L.P., 341 F.3d 256, 263 (3d. Cir. 2003).

Notwithstanding this strong federal policy, a court must still determine if the parties have entered into a valid arbitration agreement. Id. at 264. To make this determination, the court considers the law of the forum state. Id. Additionally, an agreement "may be unenforceable based on generally applicable contractual defenses, such as unconscionability." Id. Thus, consideration of an arbitration clause's validity involves a two-step process: (1) whether an agreement to arbitrate exists, and if so (2) whether the dispute falls within the scope of that agreement. Invista S.Á.R.L. v. Rhodia, S.A., 625 F.3d 75, 84 (3d Cir. 2010).

If the two prong test outlined above is met, the controversy must be submitted to arbitration. Callan v. Oxford Land Development, Inc., 858 A.2d 1229, 1233 (Pa.Super. 2004). Here, plaintiff contends that no agreement to arbitrate exists because the arbitration provision is unconscionable and therefore

unenforceable.  Alternatively, plaintiff contends her claim is beyond the scope of the agreement.

Unconscionability

Unconscionability may be found when one party to an agreement shows "an absence of meaningful choice together with contract terms which are unreasonably favorable to the other party." <u>Witmer v. Exxon Corporation</u>, 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981); <u>Hopkins</u>, 643 F.Supp.2d at 716 (applying Pennsylvania law).  The burden of proof rests with the party challenging the validity of a contract or provision to present facts giving rise to unconscionability.  <u>Hopkins</u>, 643 F.Supp.2d at 716.

Unconscionability has both a procedural and substantive element, and under Pennsylvania law, both must be met before a court will invalidate an arbitration agreement.  <u>Id.</u>

Procedural unconscionability bears on the circumstances surrounding the manner in which an agreement is reached, along with the form and appearance of the agreement itself.  <u>Somerset supra</u>, 832 F.Supp.2d at 487.

Substantive unconscionability pertains to the specific terms contained in the agreement.  <u>Id.</u> at 488.  Substantively unconscionable terms are those that are "unreasonably or grossly favorable to one side and to which the disfavored party does not

assent.  <u>Id.</u> <u>quoting</u> <u>Harris v. Green Tree Financial Corporation</u>,
186 F.3d 173, 181 (3d Cir. 1999).

A contract or provision of a contract is deemed
procedurally unconscionable when the challenging party lacked
meaningful choice when signing the challenged provision.
<u>Hopkins</u>, 643 F.Supp.2d at 717, <u>quoting</u> <u>Witmer</u>, 495 Pa. at 551,
434 A.2d at 1228.  Such a lack of meaningful choice is often
found where there is a contract of adhesion.[32]  <u>Hopkins</u>,
643 F.Supp.2d at 717.  However, simply determining that the
challenging party has signed an adhesion contract does not
require a finding the contact or specific provision is
unconscionable.  <u>Thibodeau v. Comcast Corporation</u>, 912 A.2d 874,
886 (Pa.Super. 2006).

There are numerous factors courts may consider when
determining if a contract or provision is procedurally
unconscionable.  These factors include "the take-it-or-leave-it
nature of the standardized form of the document, the parties'
relative bargaining positions, and the degree of economic
compulsion motivating the adhering party."  <u>Quilloin v. Tenet
HealthSystem Philadelphia, Inc.</u>, 673 F.3d 221, 235-236 (3d Cir.
2012) (internal quotes omitted); <u>see e.g.</u>  <u>Nino v. Jewelry
Exchange, Inc.</u>, 609 F.3d 191 (3d Cir. 2010).  Another factor

---

[32]     An adhesion contract is one "prepared by a party with excessive
bargaining power and presented to the other party on a take it or leave it
basis."  <u>Hopkins</u>,  643 F.Supp.2d at 717 (internal quotes omitted).

courts may look to is the educational background of the challenging party. Compare Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224 (3d Cir. 2008), with Alexander, supra.

In Nino, the United States Court of Appeals for the Third Circuit held that an employment contract was procedurally unconscionable where the employee was in a significantly weaker bargaining position and was dependent on the employer for his legal immigration status. Nino, 609 F.3d at 202.

On the other hand, in Quilloin the Third Circuit determined that an arbitration agreement was not procedurally unconscionable when a college-educated employee signed an arbitration agreement even though she was in a weaker bargaining position and may not have seen or signed the arbitration agreement until after beginning work. Quilloin, 673 F.3d at 237.

Here, plaintiff has failed to establish that the arbitration provision was procedurally unconscionable.

Plaintiff contends that the agreement to arbitrate was procedurally unconscionable because (1) it was included in a stack of 87 documents she believed required her signature before Green Meadows would admit her mother, and (2) Mrs. Schoch was in a weak, almost desperate, position and the admission documents were presented to her with little explanation in a take-it-or-leave-it fashion.

However, Mrs. Schoch's own account of the circumstances surrounding the signing of the arbitration agreement indicate that she had a meaningful choice to sign the contract.

First, the plain language of the agreement indicates that "[a]dmission to the Community is not contingent upon signing this Agreement." Mrs. Schoch indicated that she read and understood the agreement. Further, both Mrs. Schoch and her sister were provided with opportunities to ask questions about the agreement.

Mrs. Schoch further admitted to reading and understanding the "Opt Out Provision," which gave her until April 9, 2010 to revoke the arbitration provision. She admitted receiving a copy of the agreement on or about April 1, 2010 and looking it over again. Therefore, Mrs. Schoch had an extra week to exercise the provision but stated she did not think to exercise it. Accordingly, this contract was not presented in a "take-it-or-leave-it nature". See Quilloin, 673 F.3d at 235-236.

Moreover, Mrs. Schoch stated that there were two facilities that met her mother's needs: Green Meadows and Lehigh Commons. Mrs. Schoch chose Green Meadows because it was more convenient and more comfortable for her mother. Accordingly, Mrs. Schoch had a meaningful choice as to whether to sign the agreement.

In her affidavit, Mrs. Schoch stated that the Green Meadows representative "made it clear" to her she must sign all of the documents, including the arbitration agreement, before her mother would be admitted and that she was given very little time to go over the documents prior to signing.

Generally, this would be sufficient to create issues of fact concerning whether an enforceable agreement was made because when "[a]n unequivocal denial that the agreement has been made, accompanied by supporting affidavits", that is sufficient to require a trial to determine the existence of an agreement. Park-Knit Mills (supra), 636 F.2d at 55.

However, Mrs. Schoch's deposition contains conflicting evidence that, taken with the affidavit, establish that no genuine factual dispute exists surrounding the signing of the agreement.

As the Third Circuit has held:

> When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists. The objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit.

<u>Hackman v. Valley Fair</u>, 932 F.2d 239, 241 (3d Cir. 1991)

(internal quotes omitted).[33]

Here, although Mrs. Schoch's affidavit proffers that she was told she had to sign all of the admission documents, including the arbitration agreement, her deposition merely states that the Green Meadows' representative did not affirmatively indicate that the documents could remain unsigned.

Moreover, Mrs. Schoch's affidavit claims that they spent just minutes going over all of the documents. However, in her deposition, she stated that she not only received an overview of all of the 87 documents contained in the admission packet, including the arbitration agreement, but that she and her sister

---

[33] In <u>Hackman</u>, a terminated employee brought a claim against his union for breach of its duty of fair representation after the union decided not to proceed to arbitration with the employee's underlying grievance against his employer. <u>Id.</u> at 240. The union moved for summary judgment asserting that the employee's claim was barred by a six-month statute of limitations. <u>Id.</u> For statue-of-limitations purposes, the court needed to determine when the employee first learned of the union's decision not to further assist him. <u>Id.</u>

In his deposition, the employee admitted that he was told of the union's decision not to request arbitration more than six months before he filed suit. <u>Id.</u> In a later affidavit, however, the employee complained of being confused during the deposition and stated that he learned of the union's decision less than six months prior to filing suit. <u>Id.</u> at 241. Based on the contradictions in the employee's affidavit and deposition testimony, the district court found no genuine issue of material fact and granted the union's motion for summary judgment. <u>Id.</u>

The Third Circuit upheld the district court's rejection of the employee's attempt to contradict his deposition testimony with a later affidavit stating, "we are persuaded that the district court properly determined that there was no genuine issue of material fact." <u>Id.</u>

Similarly, in <u>Penchishen v. Stroh Brewery Co.</u>, 932 F.Supp. 671 (E.D.Pa. 1996)(Joyner, J.), this court held that a plaintiff may not "create a genuine issue of material fact via an affidavit that contradicts the party's own deposition testimony." <u>Id.</u> at 676.

were given ample opportunity to ask questions about each document.

Mrs. Schoch's own account of the circumstances surrounding the signing of the arbitration agreement indicates that she had a meaningful choice.  Therefore, plaintiff has not established that the arbitration agreement is procedurally unconscionable.

Because both procedural and substantive unconscionability must be present to invalidate an agreement, I do not evaluate whether the agreement is substantively unconscionable.  The arbitration agreement is valid and enforceable.

<u>Scope of the Arbitration Agreement</u>

Plaintiff also contends that her negligence claim brought in Count I of the Complaint falls outside the scope of the agreement.  Specifically, plaintiff makes two broad contentions regarding the agreement's scope: (1) the Federal Arbitration Act ("FAA") only contemplates commercial transactions, and (2) the death of Mrs. Hodges was not contemplated by the parties.  For the following reasons, I reject plaintiff's contentions and find that the plaintiff's claim is within the scope of the arbitration agreement.

The FAA provides that "an agreement in writing to submit to arbitration an existing controversy arising out of such

a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C.§ 2.

Under Pennsylvania law, "the issue of whether a particular dispute falls within a contractual arbitration provision is a matter of law for the court to decide." City of Scranton v. Heffler, Radetich & Saitta, LLP, 871 A.2d 875, 880 (Pa.Commw. 2005).  When doubt is raised as to the scope of an arbitrable issue, Pennsylvania follows the liberal federal policy of the FAA that "issue[s] should be resolved in favor or arbitration.  McNulty v. H&R Block, Inc., 843 A.2d 1267, 1271 (Pa.Super. 2004).

Although the law favors the settlement of disputes by arbitration, "a court must be careful not to extend an arbitration agreement by implication beyond the clear, express and unequivocal intent of the parties as manifested by the writing itself."  Midomo Company, Inc. v. Presbyterian Housing Development Company, 739 A.2d 180, 190 (Pa.Super. 1999). "[P]aramount importance" must be given to the intent of the parties and must include the "most reasonable, probable, and natural conduct" of the parties.  Id. at 191.

When "ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective

intentions, that matter." <u>Long v. Brown</u>, 399 Pa.Super. 312, 321, 582 A.2d 359, 363 (1990).

Plaintiff contends that the FAA contemplates commercial transactions only. However, plaintiff does not explain why the contract between her and defendants does not qualify as a commercial transaction.

If an arbitration agreement is in writing and "evidences a transaction involving commerce to settle by arbitration any controversy," the agreement is within the scope of the FAA. <u>Peltz ex rel. Estate of Peltz v. Sears, Roebuck & Co.,</u> 367 F.Supp.2d 711, 717 (E.D.Pa. 2005)(Bartle, J.), <u>quoting</u> 9 U.S.C. § 2. Mrs. Hodges's admission as a resident at Green Meadows, memorialized through the resident agreement, plainly involves commerce. Therefore, I reject plaintiff's contention that her claim is beyond the scope of the agreement because the FAA only applies to transactions involving "commerce".

Nor does plaintiff's claim against Green Meadows fall outside of the scope of the agreement because of the gravity and extent of the damages.[34] Courts have previously held that arbitration agreements may extend to wrongful death and survival actions.

---

[34]    To the extent that plaintiff contends that the arbitration of claims involving personal injury resulting in death violates public policy, the United States Supreme Court has firmly struck down such a categorical ban. <u>See</u> <u>Marmet Health Care Center, Inc. v. Brown</u> __ U.S. __, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012), <u>rev'g per curiam</u> <u>Brown v. Genesis Healthcare Corporation</u>, 724 S.E.2d 250 (W.Va. 2011).

In <u>Peltz</u>, this court held that plaintiff's survival actions and claims for wrongful death were within the scope of a broad arbitration agreement. <u>Id.</u> at 718. The arbitration agreement in <u>Peltz</u> stated,

> Any and all claims, disputes or controversies of any nature whatsoever[,] whether in contract, tort, or otherwise, including statutory, common law, fraud or other intentional tort...arising out of, relating to, or in connection with (1) this Agreement, [or] (2) the relationships which result from this Agreement,...shall be resolved...by final and binding arbitration before a single arbitrator.

<u>Id.</u> at 716. The district court held that the plain language of the agreement, using ordinary contractual interpretation methods, covered the wrongful death and survival actions.

The fact that the agreement did not use the words "wrongful death" or "survival action" did not narrow the scope of the agreement. <u>Id.</u>

Similarly, in <u>Muhlenberg Township School District Authority v. Pennsylvania Fortunato Construction Co.</u>, 460 Pa. 260, 333 A.2d 184, (1975), the Supreme Court of Pennsylvania held that if an arbitration agreement covers all claims arising between the parties, all claims will be subject to arbitration. <u>Id.</u>, 460 Pa. at 264, 333 A.2d at 186.

In <u>Muhlenberg</u>, the arbitration clause stated, in relevant part:

> 1.  Should either party to this Contract suffer damages **in any manner** because of any wrongful act or neglect of the other party or of anyone employed by him, then he shall be reimbursed by the other party for such damages.
>
> 2.  Claims...**except as expressly stipulated otherwise in the case of faulty work or materials**...shall be adjusted by agreement or arbitration.

Muhlenberg, 460 Pa. at 264, 333 A.2d at 186. (emphases added).

The state Supreme Court was satisfied that the language, "suffer damage in any manner" was all-inclusive, especially when read with the language exempting from arbitration claims involving faulty work or materials. Id.

Here, like the agreement in Peltz, the arbitration agreement between plaintiff and defendants is broad. Specifically, section 2 of the arbitration agreement signed by Mrs. Schoch specifically states, in relevant part:

> **[A]ny action, dispute, claim or controversy of any kind, whether in contract or in tort**, statutory or common law, **personal injury**, property damage, legal or equitable or otherwise, **arising out of the provision of assisted living services**, healthcare services, or any other goods or services provided under the terms of any agreement between the Parties, including the disputes involving the scope of this Arbitration Agreement, **or any other dispute involving acts or omissions that cause damage or injury to either Party**, except for matters involving evictions, shall be resolved exclusively by binding arbitration and not by lawsuit....[35]

---

[35]    Arbitration Agreement, § 2 (emphasis added).

Not only does the agreement state, by its express terms, that personal injury is within the purview of the agreement, but the language is written to include "any action, dispute, claim or controversy of any kind" that arises out of assisted living services, health care services, and any other agreement between the parties.

Additionally, similar to the agreement in Muhlenberg, which excluded faulty work or materials, the arbitration agreement signed by Mrs. Schoch contains an exception specifically excluding evictions from the scope of the agreement. However, this narrow exception for evictions is inapplicable, which indicates that, as in Muhlenberg, arbitration is the proper forum for this dispute.

Mrs. Schoch contends that because the parties failed to discuss such a grave outcome as the cause of her mother's death and that the agreement did not use the words "death," "homicide," or "murder," plaintiff's claims are outside the scope of the agreement.

However, the agreement does not need to specifically enumerate claims for torts resulting in death in order to encompass those claims. See Peltz, 367 F.Supp.2d at 716.

Moreover, despite claiming that she subjectively believed that the arbitration clause would not cover the death of her mother, Mrs. Schoch did contemplate that the agreement could

cover injuries arising from intentional acts by other residents of Green Meadows.  For example, Mrs. Schoch indicated that she considered theft or destruction of her mother's personal items to be arbitrable.  She also conceded that squabbles and disagreement between residents were foreseeable and that the behavior of patients in a memory unit can be unpredictable.

Additionally, even if she subjectively believed that the agreement did not cover potential claims resulting in death, Mrs. Schoch made no outward or objective manifestations of disagreement towards the breadth of the agreement.  Only the objective outward manifestations of the intent by Mrs. Schoch matters when determining if there was a meeting of the minds.  See Long 399 Pa.Super. at 321, 582 A.2d at 363.

Accordingly, the arbitration agreement covers plaintiff's negligence claim.[36]  Because the arbitration

---

[36]     In concluding that plaintiff's negligence claim is within the scope of the arbitration agreement, I find this case to be distinguishable from Setlock v. Pinebrook Personal Care and Retirement Center, 56 A.3d 904 (Pa.Super. 2012).  In Setlock, the Superior Court of Pennsylvania found that wrongful death and survivorship claims did not fall within the scope of an arbitration agreement which covered "[a]ny Dispute [sic] controversy arising out of or in connection with [sic] **under or pursuant to this Agreement.**"  Setlock, 56 A.3d at 906 (emphasis added).

There, a nursing home resident was injured, and later died, when she was catapulted from her wheelchair because of the alleged negligence of the nursing home and the nursing home's employee.  Id. at 905-906.  The injury occurred while the resident was being escorted by the nursing home's employee to a doctor's appointment outside the nursing home's premises.  Id. at 905.

The Superior Court held that plaintiff's wrongful death claim was outside the scope of the arbitration agreement because only "causes of actions arising from issues governed by the Resident Agreement" could be included.  Id. at 912.  Because the Resident Agreement itself did not govern "the

(Footnote 36 continued):

agreement is enforceable and covers plaintiff's negligence claim, I grant defendants' motion to compel arbitration.

## CONCLUSION

For the foregoing reasons, Defendant's Rule 12(b)(6) Motion to Compel Arbitration and Dismiss Counts II, III, and IV of the Complaint is granted.  Accordingly, I order the parties to submit this dispute to arbitration in accordance with the terms of their agreement.  I dismiss plaintiff's claims without prejudice to raise in arbitration the issues contained in the dismissed complaint.

---

(Continuation of footnote 36):

standard of medical care to be provided by the [nursing home's] employees," nor did it govern the home's tort liability at its facility or off premises at other facilities, plaintiff's wrongful death action was "a distinctly different cause of action from anything contemplated by the terms of the resident agreement."  Id.

Here however, the arbitration agreement signed by Mrs. Schoch does not refer to an outside document or another contract.  Instead, all claims are arbitrable if they "arise out of the provision of assisted living services, healthcare services, or any other goods or services provided under the terms of any agreement between the parties...or any other dispute involving acts or omissions that cause damage or injury to either party."  This arbitration agreement defines its own scope.  Therefore, unlike Setlock, the scope of this agreement to arbitrate is not subject to the limitations of an external document.

Plaintiff's complaint alleges that Green Meadows acted negligently by failing to (1) provide security, (2) screen patients, (3) keep patients safe, (4) provide a safe living environment, and (4) take steps to ensure the safety of Mrs. Hodges.  These claims all refer to Green Meadows duty to safe-guard the physical and mental well-being of its residents while at Green Meadows.  In other words, they arise out of Green Meadows providing "assisted living services."  Therefore, plaintiff's claim is within the scope of the agreement.